UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| SANDRA S. HILLERY., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:04CV1718 CDP |
| | ) | |
| THE LIMITED LONG-TERM | ) | |
| DISABILITY PROGRAM and | ) | |
| METROPOLITAN LIFE | ) | |
| INSURANCE COMPANY, | ) | |
| | ) | |
| Defendants. | ) | |

## **MEMORANDUM AND ORDER**

Metropolitan Life Insurance Company (MetLife) terminated the payment of long-term disability benefits to Sandra S. Hillery after it determined that she was no longer totally disabled under The Limited Long-Term Disability Program. Hillery seeks judicial review of this determination pursuant to the Employee Retirement Income Security Act of 1971 (ERISA), 29 U.S.C. § 1132(a)(1)(B). All parties now move for summary judgment. After a thorough review of the record, I find that MetLife's decision is supported by substantial evidence and therefore I will grant summary judgment in favor of the defendants.

## Background

Hillery began working as a co-manager of a Victoria's Secret store on October 21, 1990. As a Victoria's Secret employee, Hillery was a participant in The Limited Long Term Disability Program, which is a welfare benefit plan covered under ERISA. This plan entitles each participant to long-term disability benefits as long as the participant remains totally disabled. Under Section 2.26 of the plan, a participant is totally disabled if the participant:

    (a)    is under the regular care of a Physician; and

    (b)    as a result of an Illness/Injury having an Onset Date while the Participant is a Participant;

            (i)    during the twelve (12) months immediately following the Benefit Commencement Date, the Participant is unable to perform any and every duty related to the Participant's regular occupation in which he or she was engaged immediately prior to the occurrence of the Illness/Injury;

            (ii)    thereafter, the Participant cannot work at any gainful occupation for which the Participant is reasonably qualified, or could become qualified, by education, experience or training.

The plan provides MetLife, as plan administrator, with the authority to determine whether a plan participant meets this definition and is entitled to benefits.

On April 5, 1991, Hillery quit working at Victoria's Secret after her family

practitioner, Dr. Martha Miller, diagnosed her as having Systemic Lupus Erythematosus (SLE).[1] At the time, Hillery complained of pain in her feet, swelling in her joints, and oral ulcers. Hillery applied for long-term disability benefits under the plan on November 4, 1991. MetLife approved her application and Hillery began receiving payments in January, 1992.

Over the next decade, Hillery was treated by a number of doctors. Their diagnosis remained consistent: Hillery suffered from SLE and related ailments including secondary Sjogren's syndrome, Raynaud's phenonmenon, fibromyalgia, neuropathic symptoms, asthma, dry eyes, dry mouth, fatigue, and chest pains.[2] During this time, Hillery remained unemployed and visited her doctors on a regular

---

[1]SLE is defined as "an inflammatory connective tissue disease with variable features, frequently including fever, weakness and fatigability, joint pains, or arthritis resembling rheumatoid arthritis, diffuse erythematous skin lesions on the face, neck, or upper extremities, with liquefaction degeneration of the of the basal layer and epidermal atrophy, lumphadenopathy, pleurisy or pericarditis, glomerular lesions, anemia, hyperglobulinemia, and a positive LE cell test, with serum anitbodies and sometimes to double-stranded DNA and other substances." Stedman's Medical Dictionary 1037 (27th ed. 2000).

[2]Sjogren's syndrome is a chronic disorder that causes insufficient moisture production in certain glands in the body. This is often associated with rheumatoid arthritis and Raynaud's phenomenon. Stedman's, at 1767. Raynaud's phenomenon is defined as a "spasm of the digital arteries, with blanching and numbness or pain of the fingers, often precipitated by cold. Fingers become variably red, white, and blue." Id. at 1365. Fibromyalgia is "a syndrome of chronic pain of musculoskeletal origin but uncertain cause." Id. at 671.

basis.

In the spring of 2002, Hillery's doctors first noted that her SLE no longer appeared to be active. Dr. Jacqueline Dean, a rheumatologist who evaluated and treated Hillery, made this determination based on the results of Hillery's lab tests. Dr. Dean concluded that the "bulk of [Hillery's] problems" were attributable to her fibromyalgia. On January 14, 2003, Dr. Terry Moore confirmed Dr. Dean's assessment that Hillery did not have any lupus activity. Dr. Moore recommended Tylenol on an as needed basis, precautions against cold weather, and restorative sleep and water aerobics to treat Hillery's complaints of pain and fatigue. Despite the absence of lupus activity, Hillery's doctors still did not believe that she could perform her job duties. According to Dr. Eileen Lamb, a rheumatologist who examined Hillery in January, 2003, Hillery was unable to return to work due to inflammatory arthritis, chronic pain, and cognitive difficulty.

Responding to reports that Hillery's lupus was not active, MetLife sought several additional medical opinions to re-evaluate the severity of Hillery's physical impairments. On April 1, 2003, Dr. Gary Greenhood, MetLife's physician consultant, conducted an independent medical review of Hillery's recent medical records. Dr. Greenhood agreed with Hillery's treating physicians that she suffered from SLE, Raynaud's phenomenon, Sjogren's syndrome, and fibromyalgia.

4

However, Dr. Greenhood concluded from his review of the records that objective clinical findings indicated that Hillery's SLE was mild, and thus could not explain the pain and fatigue that Hillery claimed to experience. Dr. Greenhood stated that her subjective complaints were attributable to fibromyalgia, and that "[most] patients that have fibromyalgia are capable of work in the sedentary to light categories." Additionally, Dr. Greenhood failed to find objective evidence in the records to substantiate previous diagnoses of peripheral neuropathy or cognitive deficit. Despite these findings, Dr. Greenhood listed Hillery's prognosis for a return to work as "poor" based on the length of time she had been out of work and her age, not her physical impairments.

MetLife then asked Hillery to undergo an independent medical examination (IME) with Dr. Suseela Samudrala. Dr. Samudrala reviewed Hillery's medical records and conducted a forty-five minute physical examination. At the time, Hillery complained of pain in the chest, legs, hands, feet, and back, numbness and tingling in the hands and feet, eye pain when reading or writing, sensitivity to fluorescent lights, asthma, and various allergies, among other ailments. Dr. Samudrala's physical and motor examinations of Hillery revealed normal strength, coordination, sensation, reflexes, and gait. No acute inflammatory change or swelling was discovered in Hillery's joints. Dr. Samudrala observed four Waddell

5

Signs[3] during his examination and also noted that Hillery "does not put forth full effort during the clinical examination." Dr. Samudrala described Hillery's subjective complaints as disproportionate to the clinical and laboratory findings. Dr. Samudrala concluded that Hillery was capable of light duty work that included five hours of sitting, two hours of standing, and one hour of walking per day. Dr. Samudrala, however, did recommend that Hillery complete an aggressive reconditioning program before returning to work.

On September 16, 2003, MetLife completed an Employability Assessment Report for Hillery based on Dr. Samudrala's findings. The report considered Hillery's age, medical history, motor skill impairments, education, work history, and her proximity to labor markets. Applying these factors, the report identified four

---

[3]Waddell Signs are eight clinical findings that an examining physician investigates while evaluating a patient complaining of lower back pain. Attorneys Medical Deskbook § 11:2 (3d ed. 2004). Each of these signs is caused by a non-anatomical factor and indicates that there is no physical cause of the back pain. As the AMD explains, "[o]ne or two of these signs may arise from patient anxiety or eagerness to cooperate. Three or more are usually considered sufficient to make a diagnosis of functional disorder or deliberate deception (malingering) and to rule out physical abnormality." Id. (emphasis added). See also Hilmes v. Barnhart, 118 Fed. Appx. 56, 58 (7th Cir. 2004) ("Waddell signs are manifestations of pain resulting from specific maneuvers that should not induce back pain, and are used to identify patients reacting to 'psychosocial' factors, such as economics or social issues, including pending litigation.") (citations omitted).

different jobs that Hillery was "realistically qualified to perform within the local economy."

Relying primarily on Dr. Samudrala's examination and the Employability Assessment Report, MetLife determined that Hillery no longer met the definition of totally disabled under the plan. Accordingly, Hillery's long-term disability benefits were terminated on September 18, 2003.

On March 14, 2004, Hillery submitted a written appeal to MetLife. Her appeal included new medical records from several physicians that had recently treated her. Dr. James Esther, a rheumatologist, submitted a letter dated March 14, 2004, stating that Hillery suffers from "[SLE], severe diffuse tendonitis, fibromylagia, severe Raynaud's phenomenon, Sjogrens syndrome, peripheral neuropathy, arthritis related to her connective tissue disease and sinusitis." Dr. Esther noted that while "[a]t the present time she does meet the ARA criteria for systemic lupus, her disease is controlled with the use of medications."

Dr. Greg Berdy, an opthamologist, examined the effects of Hillery's Sjogrens syndrome on February 11, 2004. Dr. Berdy reported that Hillery's dry eyes would require her to take breaks during an 8-hour workday every two hours. Despite her complaints, Dr. Berdy noted that Hillery was capable of working with small objects such as those involved in sedentary work.

Dr. Jacqueline Reiss, an allergist, submitted a letter dated November 3, 2003, that read as follows:

> Sandra Hillery is a patient of mine. She is a 53 year old Caucasian female with a history of asthma, [SLE], seasonal allergic rhinoconjunctivitis, and sicca syndrome. In general, her asthma has been well controlled with the use of several inhaled medications. She, however, has quite a lot of difficulty with daily activities secondary to her costochondritis which has not been well controlled. She has a past medical history significant for peptic ulcer disease and an allergy to sulfa which prohibits her from taking many medications for her costochondritis.

Finally, Hillery submitted the results of several EMG tests performed by Dr. Daniel Phillips, a neurologist, dated September 25, 2003. Dr. Phillips concluded that the tests revealed "rather severe bilateral sensory motor median neuropathies across the carpal tunnels." However, test results on Hillery's lower extremities were normal. Overall, Dr. Phillips concluded that the tests were "not otherwise impressive for peripheral neuropathy or neuromyopathy."

MetLife employed Dr. Tanya C. Lumpkins, a rheumatologist, and Dr. Joseph Jares, a neurologist, to review Hillery's appeal. Both doctors reviewed the entirety of Hillery's medical records since her 1992 SLE diagnosis, including her recent submissions. Dr. Lumpkins summarized her assessment of Hillery's functional abilities as follows:

> There are insufficient medical records documenting severity of [SLE]

or other arthritic condition limiting function in terms of range of motion, muscle strength, or neurologic abnormalities that would lead to significant impairment preventing [Hillery] from being able to perform even sedentary positions. The lack of aggressive treatment by multiple rheumatologists in the intervening [twelve] years would support that the degree of systemic lupus that [Hillery] has suffered is mild-to-marginal at best and not of a disabling degree given that she has not sustained internal organ damage or involvement. The wealth of the medical supports minor symptoms affecting myalgias, arthralgias, and fatigue, which while present likely in [Hillery] is not of a degree that would prohibit gainful employment of any occupation at least in a sedentary position. From rheumatology perspective, the wealth of the medical record does not support an impairment to preclude [Hillery] from performing at least a sedentary position.
Dr. Jares's neurological assessment was consistent with Dr.

Lumpkins' findings. He concluded as follows:

> From an objective standpoint, the records do not indicate the presence of a neurological process so severe that [Hillery] would be capable of performing her usual occupation or any occupation for that matter. ... In terms of safety issues, [Hillery] does report subjective symptoms of balance difficulties, falling, coordination abnormalities, and therefore should be restricted from working heights or dangerous machinery. It does not appear that there are any restrictions necessary in terms of operating motor vehicles.

On May 17, 2004, MetLife upheld the termination of Hillery's long-term disability benefits. MetLife concluded "that the medical information provided was insufficient to document that [Hillery's] condition was of a severity to support her inability to perform any gainful occupation." Hillery commenced this action on December 10, 2004. The parties filed cross motions for summary judgment on June

9

20, 2005.

**<u>Discussion</u>**

Where an ERISA plan grants the administrator "discretionary authority to determine eligibility of benefits," the administrator's decision is reviewed for an abuse of discretion. <u>McGee v. Reliance Standard Life Ins. Co.</u>, 360 F.3d 921, 924 (8th Cir. 2004) (citing <u>Cash v. Wal-mart Group Health Plan</u>, 107 F.3d 637, 640-41 (8th Cir. 1997)). Neither party disputes that this standard applies to MetLife's decision to terminate Hillery's long-term disability benefits.

Under the abuse of discretion standard, "the plan administrator's decision to deny benefits will stand if a reasonable person could have reached a similar decision." <u>Woo v. Deluxe Corp.</u>, 144 F.3d 1157, 1162 (8th Cir. 1998) (citations omitted). A decision is reasonable if it "is supported by substantial evidence, which is more than a scintilla but less than a preponderance." <u>Woo</u>, 144 F.3d at 1162 (citations omitted). "If substantial evidence supports the decision, it should not be disturbed even if a different, reasonable interpretation could have been made." <u>McGee</u>, at 924 (citing <u>Cash</u>, 107 F.3d at 641). The Eighth Circuit has identified five factors to assist courts in determining the reasonableness of a plan administrator's actions:

(1) Whether the administrator's interpretation is consistent with the

10

goals of the Plan; (2) whether the interpretation renders any language in the Plan meaningless or internally inconsistent; (3) whether the administrator's interpretation conflicts with the substantive or procedural requirements of the ERISA statute; (4) whether the administrator has interpreted the relevant terms consistently; and (5) whether the interpretation is contrary to the clear language of the Plan.

Torres v. UNUM Life Ins. Co., 405 F.3d 670, 680 (8th Cir. 2005) (citing Shelton v. ContiGroup Cos., Inc., 285 F.3d 640, 643 (8th Cir. 2002)).

At the outset, I note that the record does not unequivocally support MetLife's decision to terminate Hillery's benefits. Reasonable minds could disagree on the extent of Hillery's physical impairment. However, after thoroughly reviewing the record, I find that there is sufficient evidence for a reasonable person to conclude that Hillery's ailments are not so severe as to render her totally disabled under the plan. Accordingly, MetLife did not abuse its discretion in deciding to terminate Hillery's benefits.

Hillery's eligibility for long-term disability benefits under the plan rests solely on the degree to which her ailments interfere with her ability to work at <u>any</u> gainful occupation for which she <u>could</u> become qualified. This is admittedly a low threshold, but it is the threshold by which the parties agreed to be bound. With this standard in mind, I turn to the evidence in this case.

MetLife determined that Hillery was capable of working in a gainful

occupation after conducting an extensive review of her medical records and physical condition. In response to a 2002 finding by Hillery's then-treating rheumatologist, Dr. Moore, that Hillery's SLE was no longer active, MetLife hired several doctors to review Hillery's physical impairments to determine the implications of Dr. Moore's report. Two years later, MetLife concluded that Hillery was no longer totally disabled after three separate doctors, Drs. Samudrala, Lumpkins, and Jares, and an Employability Assessment Report each concluded that Hillery's physical impairments were not so severe as to preclude her from working in a gainful occupation in her local economy.

Despite this evidence supporting MetLife's decision, Hillery contends that a reasonable person could not have reached a similar decision for several reasons. First, Hillery claims that the severity of her physical impairment has remained constant since she first began receiving disability payments from MetLife in 1992. She argues that the record fails to support the change of circumstances that she believes is necessary under McOsker v. Paul Revere Life Ins. Co., 279 F.3d 586, 589 (8th Cir. 2002), to uphold MetLife's termination of her benefits. I disagree.

In McOsker, the Court noted that while the prior payment of disability benefits to a plan participant does not "operate forever as an estoppel so that an insurer can never change its mind," it does constitute a "circumstance that must

12

weigh against the propriety of an insurer's decision to discontinue those payments." 279 F.3d at 589. A court should therefore focus on whether the "information available to an insurer alters in some significant way ... between the conclusion that benefits were owing and the decision to terminate them." Id. See also Walke v. Group Long Term Disability Ins., 256 F.3d 835, 840 (8th Cir. 2001) (agreeing with the district court's reversal of the termination of benefits where nothing in the claims record indicated that "a change of circumstances warranted termination of the benefits it originally granted.").

The plan administrator in McOsker terminated the plaintiff's long-term disability benefits after two years of payments. Under the plan at issue in that case, the plaintiff was not entitled to benefits if he could perform at least some of his former employment duties. The administrator originally determined that the plaintiff was entitled to benefits based on statements from the plaintiff's treating physician that he could not return to work "at [his] old employment level". The administrator's decision to terminate plaintiff's benefits was based on a similar statement from the same treating physician that plaintiff "could return to work but not at pre-disability level of functioning." The Court concluded that the administrator interpreted essentially the same statement from the same physician in a different way to justify the termination of the plaintiff's benefits. Because the

13

medical information available on the plaintiff's condition did not vary significantly from the information that originally entitled the plaintiff to benefits, the Court concluded that the plan administrator had abused its discretion by terminating the plaintiff's benefits. 279 F.3d at 589-90.

Unlike McOsker, the record in this case demonstrates that the information available to MetLife at the time Hillery's benefits were terminated varied significantly from the information that was previously available. From 1992 to 2002, the only information available to MetLife consisted of reports from Hillery's treating physicians that she could not work in any capacity. Beginning with the findings in 2002 that Hillery's SLE was no longer active, however, a second, conflicting medical opinion emerged from the reports of Drs. Greenhood, Samudrala, Lumpkins, and Jares that undermined the previous opinions of Hillery's treating physicians. Together these four medical opinions suggested that Hillery's SLE could no longer provide a simple justification for her alleged inability to work. Further review of her medical records by Drs. Lumpkins and Jares along with Dr. Samudrala's IME revealed that her physical impairments would permit her to perform the requirements of a sedentary position.[4] Specifically, Dr. Samudrala

---

[4]There is some discrepancy among the parties regarding Dr. Samudrala's use of the phrase "light duty work." In the IME, Dr. Samudrala concluded that Hillery

14

noted that Hillery could sit five hours per day, stand two hours per day, and walk one hour per day.

Additionally, the results of the Employability Assessment Report demonstrated that an individual with Hillery's education, training, experience, and physical impairments was qualified for four different sedentary positions in her local economy. Thus, this was not a case like McOsker where a plan administrator attempted to contort similar medical opinions in different ways. Instead, the record indicates that a whole new body of medical evidence had emerged which challenged the basis for MetLife's prior payments of benefits to Hillery.

MetLife was not unreasonable for relying on this new information to terminate Hillery's benefits. Recent reports from Hillery's treating physicians were

---

"will be able to perform light duty work." Hillery argues that under the plan's definition of "light duty work," Dr. Samudrala's conclusion does not support MetLife's determination that Hillery was no longer disabled. The plan defines "light duty work" to mean "work with the Employer which is structured to include functions which the Participant is capable of performing notwithstanding the Participant's Total Disability, including part-time employment." Thus, Hillery contends that a person's ability to perform light duty work as defined by the plan does not indicate that the person is no longer totally disabled.

I find no reason to impute the plan's definition of light duty work to Dr. Samudrala's use of the phrase in the IME. There is no evidence that Dr. Samudrala referenced the plan or its terms in the IME. Dr. Samudrala does, however, specifically reference the Physical Capacity Evaluation Form attached to the IME to describe what was meant by light duty work. This attached Form indicates that Hillery could return to full-time work in a sedentary capacity.

15

not entirely inconsistent with the medical opinions of Drs. Greenhood, Samudrala, Lumpkins, and Jares. Dr. Esther, her treating rheumatologist, concluded that while Hillery's SLE may again be active, it is controlled with medication. Dr. Berdy, Hillery's opthamologist, indicated that Hillery's Sjogren's syndrome would her permit her to work a full eight-hour day as long as she took periodic breaks to treat her dry eyes. Dr. Phillips, Hillery's neurologist, reported that while her test results strongly supported carpal tunnel syndrome in her hands, as a whole the same tests did not support Hillery's claim of peripheral neuropathy.

Further, even if the recent reports of Hillery's treating physicians could be construed to categorically preclude her from working in any capacity, MetLife's reliance on the contrary opinions of Drs. Samudrala, Lumpkins, and Jares would not render its termination decision unreasonable under the abuse of discretion standard. See Black & Decker Disability Plan v. Nord, 538 U.S. 822, 830-31 (2003) (plan administrators owe no special deference to the opinions of treating physicians under ERISA). The Eighth Circuit has repeatedly upheld plan administrators' reliance on IME's despite conflicting reports from treating physicians. See, e.g., Smith v. UNUM, 305 F.3d 789, 795 (8th Cir. 2002) ("UNUM's reliance on an independent examining physician's opinion rather than two treating physician's opinions is not proof of unreasonable or imprudent conduct."); House v. Paul Revere Life Ins. Co.,

16

241 F.3d 1045, 1048 (8th Cir. 2001) (noting that a plan administrator may discount a treating physician's opinion entirely "in favor of a contrary opinion produced by an independent examiner."). In sum, MetLife's past payments to Hillery do not render its decision to terminate her benefits unreasonable in light of the new medical information that became available to MetLife.

Second, Hillery claims that MetLife arbitrarily discounted her subjective symptoms and placed an undue emphasis on the objective clinical findings of her physicians. Hillery claims that nothing in the language of the plan permits MetLife to rely exclusively on objective clinical findings when exercising its discretionary authority. See Pralutsky v. Metropolitan Life Ins. Co., 316 F.Supp.2d 840, 850 (D. Minn. 2004) (holding that a general grant of discretion to the plan administrator is sufficiently broad to encompass both objective and subjective evidence).

While I agree with Hillery's interpretation of the plan's language, I disagree with her characterization of MetLife's consideration of her subjective symptoms. The record reveals that MetLife considered, in much detail, the wide spectrum of Hillery's subjective and objective symptoms. For example, Dr. Samudrala's IME alone lists ten different subjective symptoms identified by Hillery. More importantly, MetLife's decision to discount the severity of these subjective symptoms is supported by substantial evidence in the record. Drs. Lumpkins, Jares,

17

and Samudrala each concluded that Hillery's subjective complaints were unsupported by her medical history and the results of Dr. Samudrala's physical examination. Additionally, Dr. Samudrala's observation of several Waddell's signs during Hillery's examination suggested that Hillery was not entirely credible in her complaints of subjective symptoms. Cf. Abrams v. Cargill, 395 F.3d 882, 887 n.3 (8th Cir. 2005) (noting that plan administrators may not require objective medical evidence unless there is a finding that the plaintiff is not credible in her complaints) (emphasis added). With this evidence in hand, I cannot say that MetLife arbitrarily discounted Hillery's subjective symptoms. Rather, the record reveals that these symptoms were fully considered by MetLife and were discounted based on the medical opinions of reviewing physicians.

Finally, Hillery argues that Metlife failed to adequately consider her long absence from work and how it would affect her ability to secure employment. Again, I disagree with Hillery's interpretation of the record in this case. The Employability Assessment Report specifically refers to Hillery's age and the fact she had not worked since 1991. The Report concluded that Hillery was "realistically qualified to perform" four positions within her local economy based on her education, training, experience, and physical limitations. These positions included customer complaint clerk, collection clerk, customer order clerk, and

18

information clerk/receptionist.

For the reasons listed above,

**IT IS HEREBY ORDERED** that defendants The Limited Long-Term Disability Program and Metropolitan Life Insurance Company's joint motion for summary judgment [# 21] is granted.

**IT IS FURTHER ORDERED** that plaintiff Sandra S. Hillery's motion for summary judgment [# 24] is denied.

A separate judgment is entered this same date.

_____
CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 26th day of September, 2005.